**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KIMBERLY FLANAGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06 C 1462 |
| | ) | |
| OFFICE OF THE CHIEF JUDGE OF THE | ) | Judge Rebecca R. Pallmeyer |
| CIRCUIT COURT OF COOK COUNTY, | ) | |
| ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

In August 2002, Plaintiff Kimberly Flanagan filed a charge of employment discrimination against her employer, the Cook County Adult Probation Department ("Adult Probation Department"), with the Equal Employment Opportunity Commission ("EEOC"). Flanagan, a probation officer, alleged that the Adult Probation Department had discriminated against her on the basis of her race and sex by failing to promote her and by failing to transfer her to a weapon-carrying unit. After receiving a notification of her right to sue from the EEOC, Flanagan filed a Complaint of race and sex discrimination against Defendant Office of the Chief Judge of the Circuit Court of Cook County, Illinois ("Cook County") in this court in December 2002. In July 2004, Judge Plunkett granted summary judgment in favor of Defendant Cook County on the race discrimination claim; Flanagan's sex discrimination claim survived summary judgment.

In the meantime, Flanagan continued to work with the Adult Probation Department and experienced what she considered acts of retaliation. In March 2006, Flanagan filed a second lawsuit, alleging unlawful retaliation. The two cases were consolidated. In January 2007, a jury trial was held, resulting in a verdict for Defendant on Flanagan's sex discrimination claim. Flanagan, however, prevailed on her retaliation claim and was awarded $205,000 in damages. Defendant has moved the court to vacate the jury's verdict and enter judgment as a matter of law for Defendant on Flanagan's retaliation claim. When adjudicating this motion, the court must view

all evidence in the light most favorable to Flanagan and draw all reasonable inferences in her favor. Applying this standard, as explained below, Defendant's renewed motion for judgment as a matter of law is denied.

## BACKGROUND

**A.    The 2002 Complaint**

Plaintiff's retaliation claim arises out of actions that Adult Probation Department supervisors took against Flanagan from early 2004 through the summer of 2006. Some background about her employment is, however, necessary to understand her claim. Flanagan began working for the Adult Probation Department on February 16, 1999. (Flanagan, 1/23/07 p.m. Trial Tr. 20:10-12.) She filed a charge of discrimination with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission ("EEOC") on August 28, 2002, and filed a complaint with this court on December 18, 2002, *Flanagan v. Office of the Chief Judge of the Circuit Court of Cook County, Illinois*, Case No. 02-cv-09190 ("2002 Complaint"). In the 2002 Complaint against Cook County, Flanagan alleged that the Adult Probation Department had failed to promote her, and had failed to transfer her to a position in which she was authorized to carry a weapon, on the basis of her race and sex. (2002 Compl., at 4.)[1]

In 2004, Judge Plunkett ruled on Defendant's motion for summary judgment on the 2002 Complaint. Judge Plunkett noted that Flanagan's discrimination claims fell into three categories: Flanagan contended that Defendant "discriminated against her on the basis of her sex and race when it: (1) refused to requalify her to carry a weapon in 2000, precipitating her transfer to the

---

[1]    Although neither Party raises this issue as significant, the record is unclear regarding when Adult Probation Department supervisors became aware of Flanagan's action before the EEOC and litigation in this court. Donna Vaughan and James Cunningham were each named as respondents in Flanagan's EEOC Complaint, (2002 Compl., at 8-11), and presumably were notified of Flanagan's claims at that time. Vaughan was the Director of Human Resources. (Vaughan, 1/19/07 Trial Tr. 101:8-15.) Until his retirement in 2003, Cunningham was one of four Assistant Chief Probation Officers. (Cunningham, 1/22/07 a.m. Trial Tr. 67:23-68:12.) Cunningham's direct supervisor was Veronica Ballard, the Chief Probation Officer. (Lisle, 1/17/07 Trial Tr. 2:15-20.)

Domestic Violence Unit; (2) delayed her transfer from the Domestic Violence Unit to the Probation Unit from November 2001 until August 2002; and (3) transferred her out of the Probation Unit in August 2002 because it deemed her psychologically unfit to carry a weapon." (Mem. Op. and Order in Case No. 02-cv-09190, dated 7/13/04, at 6.) Judge Plunkett found that Flanagan's claims of discrimination based on weapon requalification and transfer delay were time-barred. (*Id.* at 7-9.) In addition, he found insufficient factual support for Flanagan's race discrimination claim, (*id.* at 11-12), but denied summary judgment on Flanagan's claim that her 2002 transfer out of the Probation Unit was a product of sex discrimination. (*Id.* at 14)

**B.      Adult Probation Department's Retaliation**

After filing the 2002 Complaint, Flanagan suffered employment actions she believed were materially adverse and in retaliation for charging the Adult Probation Department with discrimination. Viewing the evidence in the light most favorable to Flanagan, the conduct at issue can be categorized into the following incidents.

**1.      Veronica Ballard Comments**

The conduct Flanagan classifies as retaliatory began on March 17, 2004. On that date, Flanagan, Carolyn Lisle, Everett Harris, and several other probation officers attended a meeting about the "What Works" program with Veronica Ballard, then the Chief Probation Officer. (Lisle, 1/17/07 Trial Tr. 102:17-22, 103:16-19.) Lisle is one of approximately ten Deputy Chief Probation Officers. (*Id.* 2:4-6; 3:9-11.) Harris was, until he retired in July 2006, a supervisor in the Adult Probation Department. (Harris, 1/22/07 p.m. Trial Tr. 48:17-49:17.) He was Flanagan's supervisor for a time that included the March 2004 meeting. (*Id.* 49:18-21.)

The "What Works" program was supported by a federal grant, which enabled the Department to initiate new training programs and techniques intended to reduce recidivism for probationers. (Lisle, 1/17/07 Trial Tr. 103:20-25.) After Ballard's "What Works" presentation, Flanagan made comments expressing doubt that the program would work and characterizing

probation officers as "law enforcement" officers.  (*Id.* 107:21-108:5; *see also* Harris, 1/22/07 p.m. Trial Tr. 78:25-79:11.)  Ballard responded–in the hearing of the entire group–that, "if she [Flanagan] did not like what she [Ballard] was telling her, that she needed to find her a new job."   (Harris, 1/22/07 p.m. Trial Tr. 79:12-18; *see also* Lisle, 1/17/07 Trial Tr. 108:16-20.)  Everett Harris recalled that "[e]verybody reacted to" Ballard's reprimand, some laughing and others just astounded. (Harris, 1/22/07 p.m. Trial Tr. 80:2-9.)  Following this run-in, Ballard asked Lisle to set up a meeting for Ballard, Lisle, Flanagan, Harris, and Lisle's direct supervisor, Assistant Chief Probation Officer Tom Quinn. (Lisle, 1/17/07 Trial Tr. 42:4-15; 108:24-109:25.)  At the meeting, Ballard expressed that she "wasn't happy" with Flanagan's and Harris's conduct during the "What Works" meeting and reiterated differences between a probation officer and a law enforcement officer. (*Id.* 111:8-112-3.) Ballard accused Flanagan and Harris of being inattentive during the "What Works" meeting, although Lisle testified that she did not observe either Flanagan or Harris being inattentive.  (*Id.* 51:17-52:3.)  Harris testified that Ballard also told Flanagan that "she couldn't stand her" at that meeting.  (Harris, 1/22/07 p.m. Trial Tr. 83:15-84:5.)

Despite Ballard's harsh comments, Harris observed that nothing Flanagan did at the "What Works" training or at the meeting was disrespectful toward Ballard.  (*Id.* 84:19-25.)  Harris further noted that there was an ongoing debate in the office regarding whether probation officers are law enforcement or social service officers.  (*Id.* 78:25-79:11; *see also* Lisle, 1/17/07 Trial Tr. 106:12-19 (acknowledging the ongoing debate).)  In the end, no formal discipline was issued against Flanagan or Harris.  (Lisle, 1/17/07 Trial Tr. 112:1-3.)

## 2. Performance Evaluations

The next incident of alleged retaliation relates to Flanagan's 2004 performance evaluations. Harris helped to develop the department's performance evaluation process, including the forms used by the department.  (Harris, 1/22/07 p.m. Trial Tr. 66:3- 67:6.)   For many years after

developing the process, Harris implemented it, evaluating employees; during that time, no one criticized a performance evaluation he completed. (*Id.* 65:23-66:2; 67:7-12.)

Harris's 2004 evaluation of Flanagan was the first to be questioned by anyone in the Department. (*Id.* 67:13-20.) According to Harris, Carolyn Lisle questioned that evaluation. Without offering any explanation for criticizing the score he awarded Flanagan, (*id.* 71:20-25), Lisle told Harris to lower Flanagan's scores so that she would not receive an "exceeds expectations" rating. (*Id.* 94:11-95:7.)[2] Harris stood by the accuracy of his evaluation and refused to make any changes. (*Id.* 71:20-25.) Lisle wrote Harris up for insubordination; Harris wrote Lisle up as well. (*Id.* 72:1-12.) No disciplinary action was ever taken. (*Id.* 72:16-19.) Lisle, however, later changed the performance evaluations of the other probation officers supervised by Harris. (*Id.* 75:7-15.) Lisle testified that she changed approximately seven or eight other evaluations because, like Flanagan's, they were "wrong." (Lisle, 1/17/07 Trial Tr. 130:19-131:13; 136:21-137:10.)

### 3. Assault of Dickerson

In April 2005, Flanagan was investigated for an alleged assault of another probation officer, Michael Dickerson. (Flanagan, 1/24/07 a.m. Trial Tr. 45:16-46:6.) Dickerson, a probation officer in the gang unit, (Dickerson, 1/24/07 a.m. Trial Tr. 79:6-12, 80:1-6), claimed that, on April 7, 2005, while he was conducting a training, Flanagan exited the elevator and elbowed him twice in the chest. (*Id.* 87:9-88:8.) Flanagan was wearing full duty gear at the time, and Dickerson was wearing a "RedMan." (*Id.* 88:9-89:1.)[3] Wallace Johnson, also a probation officer with the gang unit,

---

[2]     Lisle claims that, after reviewing Flanagan's performance evaluation, Phillip Loizon informed her that the mathematical formula used by the Adult Probation Office couldn't have yielded the scores on Flanagan's evaluation. (Lisle, 1/17/07 Trial Tr. 128:20-25.) Loizon is a Deputy Chief Probation Officer. (Loizon, 1/17/07 Trial Tr. 163:3-8.) According to Lisle, when she recalculated Flanagan's scores, she found that Harris's calculations were wrong. (Lisle, 1/17/07 Trial Tr. 129:1-25.) She told Harris this, and Harris told her that he did not use the mathematical formula. (*Id.* 130:6-14.)

[3]     Carolyn Lisle explained that the RedMan is a red, thickly padded outfit with a large
(continued...)

observed the incident and corroborated Dickerson's summary of it. (Johnson, 1/24/07 a.m. Trial Tr. 112:3-11, 113:9-114:13.) Dickerson filed an incident report, in which he claimed that Flanagan had assaulted him. (Dickerson, 1/24/07 a.m. Trial Tr. 94:14-25.) He also had an attorney write a letter to the Adult Probation Department regarding the incident. (*Id.* 96:21-97:6.) At least four or five meetings were held regarding the alleged assault. (Flanagan, 1/24/07 a.m. Trial Tr. 46:7-47:13.) After this investigation, Flanagan received a written reprimand for her actions. (*Id.* 48:24-49:1.) She believes that the reprimand was unwarranted and that she did nothing wrong. (*Id.* 53:11-13.)

### 4. Reyes Comments

In August 2005, Jesse Reyes replaced Ballard as Chief Probation Officer. (Reyes, 1/24/07 p.m. Trial Tr. 1:23-2:5; 2-15-16.) When Flanagan introduced herself to Reyes for the first time in the fall of 2005, she remembers him responding as follows: "he's like I already heard about you. I don't need to even see you. He . . . like clapped his hands together like I'm washing my hands of you. I'm done with it. And turned his back." (Flanagan, 1/26/07 a.m. Trial Tr. 49:17-23; 50:14-17.)[4] Flanagan believes Reyes had heard about her and developed this attitude toward her through James Cunningham. (*Id.*) Cunningham was a Deputy Chief Probation Officer until his retirement in 2003, and Flanagan named him as a respondent in the 2002 sex discrimination charge she filed with the EEOC. (*Id.*; Cunningham, 1/22/07 a.m. Trial Tr. 67:23-68:12; 2002 Compl., at 8-11.) Flanagan testified that the altercation she had with Reyes occurred in front of many of her colleagues, who laughed about Flanagan's interaction with her new boss. (Flanagan, 1/26/07 a.m. Trial Tr. 49:24-25; 50:3-8.)

---

(...continued)
helmet worn by the officer teaching a hand-to-hand training for weapons-carrying units. (Lisle, 1/17/07 Trial Tr. 7:4-19.)

[4]    Although Reyes did not recall the incident, (Reyes, 1/24/07 p.m. Trial Tr. 8:13-9:24), the jury was entitled to believe Flanagan's account.

### 5.    Investigations and Desk Duty

At approximately 2:05 a.m. on December 29, Flanagan and two other probation officers–Ronald Pula and Tony Rogers–came into contact with a probationer named Jason Johnson during a curfew check. (Pula, 1/23/07 a.m. Trial Tr. 8:11-9:10.)  From outside Johnson's home, Flanagan telephoned Johnson to tell him to come downstairs for his curfew check. (Flanagan, 1/23/07 p.m. Trial Tr. 60:21-25.)  Johnson told Flanagan that he was naked, (*id.* 61:1-9), which made Flanagan uncomfortable about going to Johnson's door. (*Id.* 62:7-16.)  Pula therefore went to Johnson's door to conduct the curfew check, while Rogers and Flanagan stood back, closer to the car the three officers were driving that night. (Pula, 1/23/07 a.m. Trial Tr. 12:23-13:22.)  Pula required Johnson to sign a contact form, as a way of verifying that he was home during the officers' visit. (*Id.* 14:9-15.)  During the interaction, no probation officer unholstered a service revolver or displayed handcuffs. (Flanagan, 1/23/07 p.m. Trial Tr. 63:5-20.)

Johnson reported to the Adult Probation Department, however, that Pula had gone to Johnson's door with handcuffs, intending to arrest him. (Flanagan, 1/23/07 p.m. Trial Tr. 65:16-20.)  Reyes believed the incident called into question the professionalism of probation officers and directed Donna Vaughan to investigate. (Reyes, 1/24/07 p.m. Trial Tr. 3:16-4:20.)  The next day, Flanagan and Pula were interviewed, separately, by two supervisors and a deputy chief. (Pula, 1/23/07 a.m. Trial Tr. 14:16-15:13; Flanagan, 1/23/07 p.m. Trial Tr. 65:3-14.)  Both Flanagan and Pula denied wrongdoing. (Flanagan, 1/23/07 p.m. Trial Tr. 65:16-22; Pula, 1/23/07 a.m. Trial Tr. 15:20-16:2.)  Pula further testified that he had done nothing to suggest that he was going to arrest Johnson. (Pula, 1/23/07 a.m. Trial Tr. 14:4-6.)  Despite this, Pula and Flanagan–but not Rogers–were taken off the streets for approximately three months. (*Id.* 8:15-22; Flanagan, 1/23/07 p.m. Trial Tr. 64:14-21.)  They were placed on desk duty and required to contact probationers by phone rather than make curfew checks at their homes. (Pula, 1/23/07 a.m. Trial Tr. 16:3-12.)  About a month and a half into this time on desk duty, Vaughan and a public affairs representative

again interviewed Pula and Flanagan, with a union representative present. (*Id.* 16:13-17:6; Flanagan, 1/23/07 p.m. Trial Tr. 65:23-66:15.) Pula complained formally to his union, the chief judge, and the Department of Labor and informally to Vaughan regarding this investigation. (Pula, 1/23/07 a.m. Trial Tr. 27:16-28:1.) He described the Johnson investigation as "nothing but a witch hunt." (*Id.*)

In a second incident, Pula and Flanagan came into contact with a 14-year-old boy, who asked them for police assistance. (Pula, 1/23/07 a.m. Trial Tr. 19:14-18; Flanagan, 1/23/07 p.m. Trial Tr. 68:13-22.) After being approached by the boy, Pula contacted local law enforcement as well as his supervisor. (Pula, 1/23/07 a.m. Trial Tr. 21:1-8.) While Pula was on his cell phone discussing the situation with his supervisor, Pula saw a man who had been chasing the boy. (*Id.* 21:19-22:15.) Pula stopped the unidentified man, who smelled of alcohol, and explained to the man that the 14-year-old boy claimed the man was chasing him. (*Id.* 22:6-14.) Pula talked to the man until the police arrived. (*Id.* 22:10-23:17.)

Upon learning about this incident, Reyes requested that the incident be investigated, to ensure that probation officers were following official policy and procedures. (Reyes, 1/24/07 p.m. Trial Tr. 4:21-5:15.) Deputy Chief Probation Officer Phillip Loizon interviewed Pula approximately five or six times, and Vaughan also questioned Pula. (Pula, 1/23/07 a.m. Trial Tr. 24:7-11.) In addition to the usual incident report, Pula was asked to prepare another report regarding the incident. (*Id.* 24:22-25:4.) Flanagan was also investigated by Loizon and Vaughan. (Flanagan, 1/23/07 p.m. Trial Tr. 72:16-24.) Flanagan and Pula both denied any wrongdoing. (*Id.* 72:3-5, 9; Pula, 1/23/07 a.m. Trial Tr. 21:1-5, 27:3-10.) Indeed, Pula noted that his supervisor never accused him of any wrongdoing. (Pula, 1/23/07 a.m. Trial Tr. 26:22-24.) Following this investigation, Flanagan told the Adult Probation Department "that it was becoming a hostile work environment" because "we were being criticized for saving a child who was scared and screaming for help. It

made no sense that we were being subjected to investigations when all we did was try and help a child who was upset and crying."  (Flanagan, 1/23/07 p.m. Trial Tr. 73:8-15.)

### 6.     Duty Shorts

The Adult Probation Department's scrutiny of Flanagan extended beyond her work product. During the summer of 2006, Flanagan and Loizon had an altercation regarding her clothing. (Flanagan, 1/23/07 p.m. Trial Tr. 74:1-5, 20-22.)  Loizon asked whether Flanagan was wearing the official shorts permitted by the county regulations.  (*Id.* 75:1-6.)  Flanagan said that they were official shorts, but Loizon continued to question her about them, eventually demanding that Flanagan follow him to the supervisor's office.  (*Id.* 76:23-77:4.)  Once there, Loizon asked Guy Wilson, a supervisor, whether Flanagan was wearing official shorts.  (*Id.* 77:5-6, 13-16; Wilson, 1/23/07 a.m. Trial Tr. 59:3-8.)  Wilson confirmed that Flanagan's shorts were, indeed, proper attire. (Flanagan, 1/23/07 p.m. Trial Tr. 77:17-18; Wilson, 1/23/07 a.m. Trial Tr. 83:6-13, 84:3-25.) Flanagan was embarrassed and uncomfortable about her interaction with Loizon, which called into question the duty shorts she had been wearing regularly for almost two years.  (Flanagan, 1/23/078 p.m. 77:19-24.)

## C.     The 2006 Complaint

On March 16, 2006, Flanagan filed a second complaint ("2006 Complaint"), *Flanagan v. Office of the Chief Judge of the Circuit Court of Cook County, Ill., et al.*, Case No. 06-cv-01462.  In this second lawsuit, Flanagan asserted that she had been subject to harassment, threats, disciplinary action, and heightened scrutiny since filing the 2002 Complaint.  (2006 Compl. ¶¶ 13-15.)  More specifically, she alleged that this retaliation, in violation of Title VII, included:

- •     Threats to her supervisor if he refused to lower Flanagan's annual performance evaluation scores;

- •     False accusations of assaulting another probation officer;

- •     Placing Flanagan on a less desirable schedule with officers of less seniority;

- Numerous investigations and reprimands based on false statements; and

- Placing Flanagan on desk duty.

(*Id.* ¶ 16.)  On April 21, 2006, the 2002 Complaint was consolidated with the 2006 Complaint and reassigned from Judge Plunkett to this court.  (Notification of Docket Entry in Case No. 02-cv-09190, dated April 21, 2006.)

The consolidated causes of action were set for trial on January 16, 2007.  (Notification of Docket Entry, dated 8/17/06.)  The individual Defendants–Vaughan, Loizon, Dickerson, and Lisle–moved for summary judgment on the retaliation claims against them on the grounds of qualified immunity. (*See* Mem. in Supp. of Defs.' Mot. to Dismiss Pl.'s Compl., dated 9/29/06, at 12-13.)  Because Flanagan failed to respond to the individual Defendants's motion, the court granted it, dismissing the claims against Vaughan, Loizon, Dickerson, and Lisle in their individual capacities. (Order, dated 1/17/07.)  The court, however, declined to sever the 2002 Complaint from the 2006 Complaint.  (Order, dated 1/4/07.)  The court continued Defendant Cook County''s motion for summary judgment on the 2006 Complaint pending trial on Flanagan's sex discrimination and retaliation claims.

**D.    Jury Trial**

On Flanagan's claim for sex discrimination in violation of Title VII, the jury found in favor of Defendant Cook County and against Plaintiff Flanagan.  (Judgment in Civil Case No. 02 C 9190, dated 1/29/07.)  Flanagan did not file any post-trial motions related to this verdict.  On Flanagan's claim for retaliation in violation of Title VII, the jury found in favor of Flanagan and against Cook County and awarded Flanagan $205,000 in damages.  (Order, dated 1/29/07; Verdict Form, dated 1/29/07.)  Defendant withdrew its pending Rule 50 motion as to the sex discrimination claim and continued its pending Rule 50 motion as to the retaliation claim.  (Order, dated 1/29/07.)  Defendant has not, however, moved for a new trial on Flanagan's retaliation claim.

For the reasons discussed below, the court finds that the jury's verdict on Flanagan's retaliation claim is adequately supported by the evidence. Defendant's motion for judgment notwithstanding the verdict is therefore denied.

**DISCUSSION**

**A.    Standard of Review**

Once the jury returns a verdict, the non-prevailing party may renew its Rule 50(a) motion for judgment as a matter of law and ask the court to enter judgment notwithstanding the jury's verdict. FED. R. CIV. P. 50(b).  If "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [prevailing] party," it should enter judgment as a matter of law for the non-prevailing party. FED. R. CIV. P. 50(a) & (b)(1)(C).

To sustain a Title VII claim for unlawful retaliation, a plaintiff must prove by the preponderance of the evidence: "(1) that she opposed an unlawful employment practice; (2) that she suffered an adverse employment action; and (3) that the adverse employment action was caused by her opposition to the unlawful employment practice." *David v. Caterpillar, Inc.*, 324 F.3d 851, 858 (7th Cir. 2003).  When adjudicating a renewed motion for judgment as a matter of law, a court must determine "whether, given the totality of the evidence, [plaintiff] presented sufficient evidence from which a reasonable jury could find in her favor." *Id.*  The court limits its inquiry "to whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed. . . . In other words, we are limited to assessing whether no rational jury could have found for the plaintiff." *Mathur v. Bd. of Trs.*, 207 F.3d 938, 941 (7th Cir. 2000) (internal quotation marks and citation omitted). The court may not "step in and substitute its view of the contested evidence for the jury's." *Id.* (citation omitted); *see also David*, 324 F.3d at 858.

## B.    Flanagan's Retaliation Claim

The anti-retaliation provision of Title VII prohibits an employer from "discriminat[ing] against any of his [or her] employees . . . because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title . . . ."  42 U.S.C. § 2000e-3(a).  Defendant acknowledges that "[i]t is without dispute that Title VII . . . prohibits employers from retaliating against an employee who has accused the employer of a violation of the Act."  (Def.'s Mem. of Law in Supp. of its Mot. for Directed Verdict on Pl.'s Claim. ("Def.'s Mem."), at 2.)

"[A] plaintiff alleging retaliation can prove her case either by the direct or indirect method of proof."  *Szymanski v. County of Cook*, 468 F.3d 1027, 1029 (7th Cir. 2006).[5]  Under the direct method, a plaintiff must present direct evidence that she engaged in protected activity and was subjected to an adverse employment action as a result.  *Phelan v. Cook County*, 463 F.3d 773, 787 (7th Cir. 2006).  This direct evidence may consist of an admission of retaliatory motive or "sufficient circumstantial evidence such that a jury could infer retaliation."  *Id.* at 788; *see also Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006) ("if [s]he can prove by means of circumstantial evidence that [s]he engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which [s]he complains, that is fine . . . .") (internal quotation marks and citation omitted).

---

[5]    Defendant analyzes Flanagan's claims under the direct method.  (Def.'s Mem., at 2.)  Flanagan never contests this, and there has been no evidence cited of any similarly situated employee.  Moreover, the "indirect method" of proof  (also referred to as the "burden shifting" method) arguably need not be addressed at all, post trial, because, "[a]fter a full trial, the only pertinent question is whether there was enough evidence to permit the jury to consider the ultimate questions of discrimination and retaliation."  *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 708 (7th Cir. 2004).  Instead, the court looks to the totality of evidence to determine whether it supports the jury's verdict of retaliation.  *Id.*

### 1.    Protected Activity

Defendant does not contest that Flanagan engaged in protected activity when she accused Cook County of race and sex discrimination.  Consequently, there is no dispute that Flanagan has proven the first element of a retaliation claim.

### 2.    Adverse Employment Action

Defendant claims that Flanagan did not show at trial that she suffered any adverse employment action in this matter.  (Def.'s Mem., at 2-3.)  As Defendant notes, in the context of a sex discrimination claim, the Seventh Circuit has described three categories of actionable materially adverse employment actions:

> (1) cases in which the. . . financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects . . .; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004).  Importantly, though, the standard for demonstrating a materially adverse employment action in Flanagan's workplace is lower for a retaliation claim than it would be for a sex discrimination claim, such as that raised in *O'Neal*. *Phelan*, 463 F.3d at 787 ("the range of conduct prohibited under this provision is broader than Title VII's discrimination provision").

The Supreme Court has recently clarified that Title VII's anti-retaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. __, 126 S.Ct. 2405, 2412-13 (2006).  Instead, the anti-retaliation provision provides "broad protection from retaliation." *Id.* at 2414.  Thus, an employee bringing a cause of action for retaliation "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415

(internal quotation marks and citation omitted). In other words, the Supreme Court has propounded an objective standard for evaluating employment actions. Even so, "[c]ontext matters" when determining whether an employment action is materially adverse. *Id.* For example, it is generally non-actionable for a supervisor to refuse to invite an employee to lunch. *Id.* If, however, that lunch is combined with training that might advance the employee's job opportunities, the failure to invite an employee might constitute a materially adverse employment action. *Id.* at 2415-16. Thus, "an act that would be immaterial in some situations is material in others." *Id.* at 2416 (internal quotation marks and citation omitted). The question of whether an employment action is materially adverse to Flanagan is necessarily fact-specific.

On the facts of this case, the question of whether Defendant subjected Plaintiff to a materially adverse employment action is a close one. When the evidence is viewed in the light most favorable to Flanagan, as it must be, the court finds that there was a sufficient evidentiary basis to support the jury's verdict.

***Heightened scrutiny.*** In post-trial briefing, Plaintiff identifies as a materially adverse employment action that "Flanagan's employers deprived her of job status when they removed her form [sic] her duties and placed her on desk duty." (Pl.'s Resp. to Def.'s Mots. for Directed Verdict on Pl.'s Claim ("Pl.'s Resp."), at 3-4.) That Flanagan was subject to heightened scrutiny is in fact the strongest evidence in support of her retaliation claim.

As discussed above, Defendant investigated Flanagan several times. Her supervisors asked for copies of the routes of her curfew checks, so that she could be followed in the field; an Officer Daniels commented that Loizon was trying to get Flanagan in trouble. (Flanagan, 1/23/07 p.m. Trial Tr. 57:17-58:3.)[6] This scrutiny caused other officers to complain about being assigned to work as Flanagan's partner. (*Id.*) Pula, Flanagan's temporary partner, confirmed that Loizon

---

[6]    No objection was made to the admissibility of Officer Daniels's comments, on hearsay or any another grounds.

watched Flanagan and checked her work more closely than other probation officers.  (Pula, 1/23/07 a.m. Trial Tr. 18:15-20.)  When Pula worked as Flanagan's partner, he knew he was being followed and watched, which differed from his experience working with other probation officers.  (*Id.* 19:3-13.)  He testified that he was subjected to more "accusatory" surveillance and interviews when he was partnered with Flanagan.  (*Id.* 28:2-5.)  In fact, he noted that he was never placed on desk duty or investigated until he worked as Flanagan's partner.  (*Id.* 18:15-20)

The jury could reasonably have considered the grievances Mr. Pula filed regarding this experience, calling the Johnson investigation "nothing but a witch hunt," (*id.* 27:16-28:1), as evidence that this surveillance negatively altered his workplace when he was Flanagan's partner. If the jury did so conclude, the heightened scrutiny to which Flanagan was subjected could reasonably constitute a materially adverse employment action that might dissuade an employee from making or supporting a charge of discrimination.  *See Davis v. Harris*, No. 03-3007, 2006 WL 3321630, at *27 (C.D. Ill. Nov. 14, 2006) (holding that evidence of surveillance is sufficient to "show a *prima facie* indirect case of Title VII retaliation" because it "could dissuade a reasonable person from opposing Title VII violations" but nevertheless granting defendant summary judgment where defendant offered an unrebutted, non-retaliatory explanation for the surveillance).   Thus, Defendant's argument that "Plaintiff failed to identify how she was adversely impacted as a result of these investigations," (Def.'s Mem. at 3), is simply not true.

***Desk Duty.***   In addition, it was reasonable to conclude that Flanagan's temporary reassignment to desk duty, a consequence of the investigations, was retaliatory.  Defendant argues that placing Flanagan on desk duty cannot constitute a materially adverse employment action because Flanagan "lost no pay, no status, no opportunities."  (Def.'s Reply Mem. of Law in Supp. of its Mot. for Directed Verdict on Pl's Claim ("Def.'s Reply"), at 2.)  In addition, Defendant points out that other officers were placed on desk duty pending investigations.  (*Id.*)  In fact, Defendant

notes that those employees were actually disciplined as a result of the investigated activity. (*Id.*) A reasonable jury might have rejected both arguments.

First, placing Flanagan on desk duty deprived Flanagan of status, or the "subtle indicia" of her job status. *See Bryson v. Chicago State Univ.*, 96 F.3d 912, 916 (7th Cir. 1996). "The subtle indicia of job status and reward . . . may, in a particular institution, take on an importance that may be far greater in context than would appear on the outside." *Id.* at 916-17. In *Bryson*, a sex discrimination case, the court considered the subtle indicia of job status to be "the building blocks" of a promotion. *Id.* at 917. While Flanagan never argues that placing her on job duty deprived her of the building blocks of a promotion, she did introduce testimony that it was a form of discipline evident to her colleagues. It therefore may have harmed her reputation and status within the Department.

More specifically, Reyes testified that the officers were withdrawn from the field until a determination could be made on the investigations. (Reyes, 1/24/07 p.m. Trial Tr. 13:2-8.) Here, Flanagan's and Pula's testimony provide sufficient evidence to conclude that being withdrawn from the field has a unique importance within the Adult Probation Department. Flanagan considers desk duty a form of punishment:

> Q.    Did you deem that yourself being removed from the street as a form of discipline?
>
> A.    Yes.
>
> Q.    You did not want to do desk duty that night, did you?
>
> A.    No.

(Flanagan, 1/23/07 p.m. Trial Tr. 64:22-65:1.)

Pula confirmed that a reasonable employee would agree that there is an importance, within the Adult Probation Department, to being relegated to desk duty:

> Q.    One more thing. When you were put on three and a half month desk duty, did you consider that a form of discipline?

A.     Yes, as does the whole department.

Q.     You were somewhat embarrassed?

A.     Extremely.

Q.     Because you were there.

So when you say you didn't receive any discipline as a result of the Johnson investigation or the little boy investigation that you were questioned on and were three and a half months on desk duty, did you consider that to have been discipline about those things?

A.     Yes.

Q.     And you filed grievances about them?

A.     Yes.

(Pula, 1/23/07 a.m. Trial Tr. 57:16-58:4.) In other words, placing Flanagan on desk duty communicated that her actions were considered suspect and therefore being scrutinized, a subtle indicator of diminished job status. *See Bryson*, 96 F.3d at 916-917.

In addition, placing Flanagan on desk duty constituted a reassignment to less agreeable job duties. As the Supreme Court has observed, "Common sense suggests that one good way to discourage an employee . . . from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable." *Burlington*, 126 S.Ct. at 2416. Whether a job assignment can be considered "materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 2417 (internal quotation marks and citation omitted). *See also Tart v. Ill. Power Co.*, 366 F.3d 461, 474 (7th Cir. 2004) (finding adverse employment action and reversing entry of judgment as a matter of law for defendant where employee's "preference is not idiosyncratic; it is universal"). There is no dispute that being on desk duty prevented Flanagan from performing her normal duties, (Loizon, 1/19/07 Trial Tr. 81:15-18), or that she preferred her normal

duties.  (Flanagan, 1/23/07 p.m. Trial Tr. 64:22-65:1.)  Furthermore, based on Pula's testimony that desk duty is an "extremely" embarrassing form of discipline, a reasonable jury might have determined that Flanagan's preference for street duty was not idiosyncratic but universal within the Adult Probation Department.

It is true that the hours, pay, and duties of an officer on desk duty are the same as one on street duty.  (*See* Pula 1/23/07 a.m. Trial Tr. 33:17-34:6.)  Defendant points out that "not everything that makes an employee unhappy is an actionable adverse action."  (Def.'s Reply, at 2 (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)).)  But the full sentence qualifies that statement, explaining that "adverse employment actions extend beyond readily quantifiable losses." *Smart*, 89 F.3d at 441.  The *Smart* court also noted that "[a]dverse employment action has been defined quite broadly in this circuit." *Id.*[7]  Thus, the Seventh Circuit has found that reassigning an employee to a position with equal salary, title, and benefits can constitute a materially adverse employment action for purposes of a race discrimination claim, *Tart*, 366 F.3d at 472-477, which is a higher standard than Flanagan must meet.  Where, as here, an employee is assigned to a duty so undesirable that it is considered a form of discipline, and is extremely embarrassed by that assignment, a reasonable jury could find that the employee has suffered a materially adverse employment action.  *See Collins v. State of Ill.*, 830 F.2d 692, 702-03 (7th Cir. 1987) (finding adverse employment action where plaintiff's lateral transfer was to a less desirable job, regardless of whether it impacted her salary or benefits).

Second, in light of the evidence, discussed above, that Flanagan was the subject of unusual scrutiny within the Adult Probation Department, the fact that other employees were placed on desk

---

[7]      In addition, *Smart*'s discussion of materially adverse employment actions pre-dates the Supreme Court's *Burlington* analysis.  As discussed above, *Burlington* clarified that the anti-retaliation provision of Title VII provides "broad protection from retaliation" and "is not limited to discriminatory actions that affect the terms and conditions of employment."  *Id.* at 2412-14.  *See also Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 746 (7th Cir. 2002) (finding that anti-retaliation provision of Title VII is not limited to retaliation that takes the form of a job action).

duty during pending investigations becomes irrelevant. The trial testimony permits a reasonable inference that Flanagan was investigated with particular vigor, suggesting a search for an excuse to justify punishing her with desk duty. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1377 (9th Cir. 1987) (holding that evidence that an employee was closely watched would strongly suggest search for a pretextual basis for discipline, which in turn indicates that the discipline was retaliatory). The court concludes that, although the evidence may not be overwhelming, it was sufficient to permit the jury to conclude that the scrutiny of Flanagan's work as well as her reassignment to desk duty adversely impacted her.

*Lowered scores on performance evaluations.* Plaintiff briefly suggests that "the evaluation-as-adverse-action inquiry is fact-specific." (Pl.'s Resp., at 4.) It is clear negative performance evaluations alone cannot constitute a materially adverse employment action in the Seventh Circuit. *Haywood v. Lucent Techs.*, 323 F.3d 524, 532 (7th Cir. 2003). Moreover, Flanagan never identifies any adverse consequence, quantifiable or otherwise, she suffered as a result of the 2004 evaluations. As they may serve as evidence of discrimination, *see id.*, however, they will be considered below.[8]

### 3. Causation

Defendant also claims that Flanagan did not show at trial that any adverse employment action she might have suffered was retaliatory. (Def.'s Mem., at 3-4.) Defendant argues that

---

[8] In post-trial briefing, neither party discusses the final two adverse employment actions Flanagan mentioned in her 2006 Complaint. Nonetheless, the court will address them briefly. First, Flanagan never explains how accusations that she assaulted Dickerson could constitute a materially adverse employment action, even under *Burlington.* No evidence at trial suggested that Dickerson's accusations were false, despite Flanagan's allegations in the 2006 Complaint. (*See* 2006 Compl. ¶ 16.)

Second, without more details regarding the impact of the undesirable work schedule to which Flanagan claims she was assigned, (*id.*), the court cannot find it to be materially adverse. *See Burlington*, 126 S.Ct. at 29 (holding that an employee's schedule "may make little difference to many workers, but may matter enormously to a young mother with school age children").

Flanagan must show that Defendant "would not have taken the adverse action 'but for' the protected expression." *Johnson v. Univ. of Wis.-Eau Claire*, 70 F.3d 469, 479 (7th Cir. 1995). The evidence introduced at trial permits the reasonable conclusion that the Adult Probation Department's actions were taken in retaliation for Flanagan's discrimination complaints.

**Temporal Proximity.** Defendant argues that temporal proximity itself cannot establish causation in this case. (Def.'s Mem., at 4.) Because Flanagan's complaint was filed in 2002 and the allegedly retaliatory conduct did not begin until early 2004, there is arguably no temporal proximity at all here, and certainly not enough to establish a causal connection in this case. (Def.'s Mem., at 4.) As the time between the protected activity and alleged act of retaliation lengthens, "the hint of causation weakens." *Davidson v. Middlefort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998). But the cases on which Defendant relies make clear that a lack of temporal proximity does not preclude a plaintiff from proving retaliation if she offers additional proof of causation. *Id.; Juarez v. Ameritech Mobile Comms., Inc.*, 957 F.2d 317, 321-22 (7th Cir. 1992) (rejecting six month gap between complaint and termination as a basis for causation but considering other evidence cited by plaintiff); *see also Phelan*, 463 F.3d at 787 (holding that district court "applied the wrong standard" where it based its causation analysis "exclusively" on temporal proximity); *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 616 (7th Cir. 2001) ("we have permitted retaliation charges to proceed in the face of long intervals only when additional circumstances demonstrate that an employer's acts might not be legitimate").[9]

---

[9] Defendant also cites the Seventh Circuit's holding that "[e]ven if we were to allow [plaintiff] to use all of her evidence outside the limitations period under a continuing violations theory, the gap would be over two years. Enough said." *Sweeney v. West*, 149 F.3d 550, 557 (7th Cir. 1998). The court does not believe, however, that the Seventh Circuit intended to establish a strict rule that actions taken two years after a party engaged in protected activity cannot, as a matter of law, constitute retaliation. As the Seventh Circuit held four years later: "Here the delay was exceedingly long. But the *reason* a long wait often implies no causation -- that supervisors out to punish someone likely do so at an early opportunity after the event, while delay makes an intervening cause more likely -- does not apply." *McGuire v. City of Springfield*, 280 F.3d 794, 796 (continued...)

Moreover, in context, the two-year gap between Flanagan's protected activity and retaliation is at least somewhat explicable. Flanagan's sex discrimination case was still pending at the time her supervisors allegedly began retaliating against her in 2004. In addition, Defendant transferred Flanagan to the Home Confinement Unit (a weapon unit) August 26, 2004, on the condition that she meet certain requirements. (Vaughan, 1/19/07 Trial Tr. 167:24-168:16.) Significantly, Flanagan's transfer out of the Home Confinement Unit and into a non-weapon unit in October 2000 prompted her sex discrimination case. (*See* 2002 Compl., at 8.) Thus, the jury might reasonably have surmised that Flanagan's transfer back to the Home Confinement Unit, particularly as litigation regarding her 2000 transfer progressed toward trial, motivated materially adverse employment actions against Flanagan in 2004. *Cf. Enright v. Ill. State Police*, 19 F. Supp. 2d 884, 889 (N.D. Ill. 1998) ("The delay [of two years] could just as easily indicate that defendant did not have an opportunity to retaliate until the next round of promotions.").[10]

In any case, Flanagan points to a variety of circumstances and incidents that she claims demonstrate retaliatory intent, despite the lack of temporal proximity. Since the jury ruled on Flanagan's claim on its merits, "we need only ask whether, viewing the evidence in its totality, [plaintiff] provided sufficient evidence that a rational jury could have concluded that retaliation was a determining factor" in Defendant's actions. *Mathur*, 207 F.3d at 942. Put another way, in the absence of temporal proximity the Third Circuit has found that a "pattern of antagonism" can satisfy

_____

(...continued)
(7th Cir. 2002) (granting summary judgment for defendant on plaintiff's retaliation claim but concluding that an eleven-year gap between filing of sex discrimination charge and alleged retaliatory action did not preclude inference of retaliation on the facts presented).

[10]     Although this evidence was not presented to the jury, the court also notes that the parties took significant discovery in the months directly preceding the allegedly retaliatory actions taken against Flanagan. In Case No. 02-cv-9190, at least the following Adult Probation Department witnesses were deposed: firearms instructor Frank Petrone (12/22/03), Vaughan (12/22/03), Cunningham (1/23/04), Harris (1/30/04), Flanagan (2/6/04), Carl Singletary (2/9/04), Wilson (2/10/04), and union representative James Dunaway (2/10/04). On April 19, 2004, Defendant moved for summary judgment on Plaintiff's 2002 Complaint for race and sex discrimination.

the causation element of a retaliation claim. *Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 895 (3d Cir. 1993). Such a pattern permits a court to "reasonably find that the initial series of events thus caused [the employee's and employer's] relationship to deteriorate . . . ." *Id.* Here, the totality of the circumstances shows a pattern of antagonism sufficient to support the jury's verdict that Defendant's conduct was retaliatory.

*Chief Probation Officers's comments.* If the testimony regarding Flanagan's interactions with Ballard and Reyes is true, and the court must assume it is, it demonstrates hostility toward Flanagan in the highest echelons of the Adult Probation Office. In March 2004, Ballard, then the Chief Probation Officer, publicly reprimanded Flanagan and requested a meeting to discuss the altercation. (Lisle, 1/17/07 Trial Tr. 108:16-109:25; *see also* Harris, 1/22/07 p.m. Trial Tr. 79:12-18.) At the follow-up meeting, Ballard told Flanagan–in the presence of her direct supervisor, Harris–that "she couldn't stand her." (Harris, 1/22/07 p.m. Trial Tr. 83:15-84:5.) All this occurred despite the fact that, at least in Harris's view, Flanagan was never disrespectful toward Ballard. (*Id.* 84:19-25.) In August 2005, Reyes replaced Ballard as Chief Probation Officer. (Reyes, 1/24/07 p.m. Trial Tr. 1:23-2:5, 2:15-16.) When Flanagan introduced herself to Reyes for the first time, he told her he had heard about Flanagan, didn't need to see her, and was done with her. (Flanagan, 1/26/07 a.m. Trial Tr. 49:17-23.) This incident, like the altercation with Ballard, occurred in front of many co-workers, who laughed at Flanagan. (Flanagan, 1/26/07 a.m. Trial Tr. 49:24-25; 50:3-8.) The jury might reasonably have viewed this animosity toward Flanagan as a reflection of Defendant's retaliatory intent.

*Recalculation of performance evaluations.* In the fall of 2004, Lisle instructed Harris to recalculate Flanagan's performance evaluation. (Harris, 1/22/07 p.m. Trial Tr. 71:20-25.) It was the first time anyone questioned a performance evaluation Harris issued. (Harris, 1/22/07 p.m. Trial Tr. 67:7-12.) The unusual attention paid to Flanagan's evaluation might itself be indicative of retaliatory intent toward Flanagan. But Lisle's communication with Harris went beyond this.

According to Harris, he was instructed, without explanation, to lower Flanagan's performance evaluation score. (*Id.* 71:20-25, 94:11-95:7.) When Harris refused, Lisle wrote Harris up for insubordination, and Harris wrote Lisle up as well. (*Id.* 72:1-12.) No disciplinary action was ever taken against Harris, (*id.* 72:16-19), but a reasonable jury could conclude that a retaliatory motive prompted the request to lower Flanagan's performance evaluation scores. *Cf. Smart*, 89 F.3d at 442 (holding that undeserved performance evaluations may be considered as evidence of discrimination). While Lisle also changed the performance evaluations of the other probation officers supervised by Harris, (Harris, 1/22/07 p.m. Trial Tr. 75:7-15), the jury was entitled to conclude that retaliation toward Flanagan prompted the inquiry that resulted in the recalculation of all of Harris's 2004 performance evaluations. Thus, this testimony should be considered circumstantial evidence of Defendant's retaliatory intent.

**Heightened scrutiny and desk duty.** That Flanagan was subject to exceptional scrutiny and investigation is further evidence in support of the jury's verdict. As the Eleventh Circuit has held, "[t]he pronounced increase in negative reviews and the careful scrutiny of [plaintiff's] performance, coupled with testimony suggesting that management personnel were acutely aware of [plaintiff's] EEOC charge, is sufficient to establish a causal link for [plaintiff's] prima facie case of retaliatory discharge." *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1525 (11th Cir. 1991), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1072, *as recognized in Williams v. Harco Drugs*, 896 F. Supp. 1150, 1152 (S.D. Ala. 1994). In *Weaver*, the plaintiff filed a complaint with the EEOC. *Id.* at 1524. Following this, his employer began to intensively monitor plaintiff's performance at work, including tracking plaintiff's work schedule and expense reports. *Id.* at 1525. Testimony established that plaintiff was the only employee subjected to this heightened scrutiny. *Id.*

As discussed in some depth above, trial testimony indicated that Flanagan was watched much more closely and investigated more frequently than her colleagues. (Flanagan, 1/23/07 p.m.

23

Trial Tr. 57:21-58:3; Pula, 1/23/07 a.m. Trial Tr. 18:15-20, 19:7-13, 27:16-28:5.)  The Adult

Probation Department took both Flanagan and Pula off the streets for approximately three months

and assigned them to desk duty during the pendency of investigations.  (Pula, 1/23/07 a.m. Trial

Tr. 8:15-22, 16:3-12; Loizon, 1/19/07 Trial Tr. 20:21-21:16 (Reyes put Flanagan and Pula on desk

duty because of Johnson investigation).)[11]  This discipline inflicted on Flanagan could be construed

as a form of retaliation.  That Pula was also relegated to desk duty could be said to weaken this

inference, but it does not make it unreasonable; Pula himself believed the investigation of him was

a function of his working with Flanagan. Thus, as in *Weaver*, the intense monitoring of Flanagan's

work once she returned to the Home Confinement Unit, which was clearly abnormal, bespeaks a

retaliatory motive.

> ***Harassment regarding duty shorts.***  Finally, Loizon's baseless harassment regarding
Flanagan's shorts demonstrates causation.  During this interaction, Loizon questioned Flanagan's
shorts, even asking a supervisor if they were proper.  (Flanagan, 1/23/07 p.m. Trial Tr. 74:1-5, 20-
22; 75:1-6; 76:23-77:6; 13-16; Wilson, 1/23/07 a.m. Trial Tr. 59:3-8.)  In fact, the shorts she was
wearing were not only consistent with regulations, but were the same ones she usually wore.
(Flanagan, 1/23/07 p.m. Trial Tr. 77:17-24; Wilson, 1/23/07 a.m. Trial Tr. 83:6-13, 84:3-25.)  This
interaction arguably demonstrates Loizon's hostility toward Flanagan, and his search for a reason
to discipline her.  The jury was entitled to view it as evidence of Defendant's retaliatory motive.

Taken together, this evidence of Defendant's retaliatory motive is not overwhelming.

Nevertheless, "[a] plaintiff can . . . prevail under the direct method of proof by constructing a

convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination

by the decisionmaker." *Phelan*, 463 F.3d at 780 (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d

---

[11]     Reyes denied that the investigations were initiated in retaliation against Flanagan.
(Reyes, 1/24/07 p.m. Trial Tr. 7:2-5.)  But the jury was entitled to question his credibility on that
crucial issue.

498, 504 (7th Cir. 2004)).  Such circumstantial evidence may consist "of suspicious timing, ambiguous statements oral or written . . . and other bits and pieces from which an inference of discriminatory intent might be drawn." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720-21 (7th Cir. 2005) (citation omitted).  Particularly when viewed through the generous lens appropriate on a renewed motion for judgment as a matter of law, the mosaic of evidence introduced in this trial is sufficient to permit the jury to conclude that the Defendant unlawfully retaliated against Flanagan.

## CONCLUSION

Viewing all facts in the light most favorable to Plaintiff and drawing all inferences in her favor, the evidence supports the jury's verdict in her favor.  Accordingly, Defendant's motion for judgment as a matter on her claim of retaliation and the earlier motion for summary judgment (22) are denied.

ENTER:

Dated: September 28, 2007

_____
REBECCA R. PALLMEYER
United States District Judge